# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-01353-SCT

*ARCHITEX ASSOCIATION, INC. (“ARCHITEX”)*

*v.*

*SCOTTSDALE INSURANCE COMPANY*
*(“SCOTTSDALE”)*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/14/2008 |
| TRIAL JUDGE: | HON. KENT McDANIEL |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DORSEY R. CARSON, JR. |
| | CHERI TURNAGE GATLIN |
| | JOHN MARTIN LASSITER |
| | BRADLEY BARRON VANCE |
| | ERIC FOSTER HATTEN |
| ATTORNEYS FOR APPELLEE: | JAMES W. SHELSON |
| | JAMES W. CRAIG |
| | JUSTIN L. MATHENY |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | REVERSED AND REMANDED - 02/11/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., RANDOLPH AND CHANDLER, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.    The parties and amici[1] assert the matter before this Court is a case of first impression. This Court is called upon to determine whether Architex Association, Inc.'s ("Architex") intentional hiring or utilization of subcontractors to perform work on one of its projects negates coverage included in the Commercial General Liability ("CGL") coverage part of three separate "Commercial Lines" policies issued by Scottsdale Insurance Company ("Scottsdale") to Architex.  Scottsdale prevailed on its "Motion for Summary Judgment" after the Circuit Court of Rankin County, Mississippi, held that no coverage exists.  Architex, a general contractor, appeals that ruling.

**FACTS**

¶2.    On April 14, 2000, Architex entered into a contract with Vikram Parshotam and CIS Pearl, Inc. ("CIS") to construct a Country Inn and Suites hotel ("Inn").  On July 25, 2000, a performance bond with The Hanover Insurance Company ("Hanover"), as surety, and Architex, as principal, was issued for $1.89 million pertaining to work to be performed on the Inn.  Architex used multiple subcontractors to build the Inn.

---

[1]Amicus briefs were filed in support of Architex's position by the Mississippi Department of Finance and Administration, Bureau of Building, Grounds and Real Property Management; Mississippi Insurance Department; Mississippi Department of Transportation; and the State of Mississippi, ex. rel Attorney General Jim Hood; as well as the Associated General Contractors of America and the Associated General Contractors of Mississippi ("Contractors").  Joinder in the briefs of Architex and/or the Contractors were filed by the Mississippi Asphalt Pavement Association, Inc.; the Associated Builders and Contractors, Inc., the Mississippi Associated Builders and Contractors, Inc.; the American Subcontractors Association; and the American Subcontractors Association of Mississippi.

2

¶3.     On June 21, 2002, a "Statutory Notice of Construction Lien" was filed by Architex "for construction balance due on Country Inn & Suites . . . of $256,075." Architex had yet to file suit. On July 31, 2002, CIS filed suit against Architex and Hanover. The suit alleged that Architex had breached its contract; "was negligent in the construction of the [Inn] and such negligence is the sole proximate cause or a proximate contributing cause of injuries to [CIS]"; and that the construction lien claimed by Architex constituted slander of title. Regarding breach of contract, CIS's complaint provided that Architex:

> abandon[ed] the [Inn], refus[ed] to complete the work, perform[ed] work which was contrary to the contract plans and specifications and contrary to applicable codes and building standards, and . . . fail[ed] to correct or remedy defective work. Architex has also failed to reimburse [CIS] for monies expended for the [Inn] which were to be paid by Architex.

As to Hanover, CIS asserted a "performance bond claim," stating that Hanover "has not corrected Architex's non-conforming, incomplete and defective work on the [Inn]." Architex considered the suit as a mere fee dispute, and did not notify Scottsdale of the suit or otherwise file a claim.

¶4.     It was not until September 2004 that counsel for CIS communicated to Architex an allegation that testing had revealed serious rebar deficiencies in the foundation of the Inn, *inter alia*. On October 5, 2004, Architex first notified Scottsdale of that claim. The notice of claim alleged that the "date of occurrence" was September 30, 2004, and described the purported "occurrence," as follows:

> [CIS] filed accusations of faulty work against [Architex] claiming that no rebar was placed in foundation and building is total loss. [Architex] denies this allegation and building is sound. . . . This accusation was just made by [CIS]. [Architex] has been involved in legal action against [CIS] for failure to pay

3

monies owed on this building. . . . Please contact [Architex's] attorney to coordinate defense. [Inn] was built during policy term.

Victor Hamby, the chief financial officer of Architex, testified that notice of the rebar claim "trigger[ed] an ['] occurrence['] under the policy."

¶5. On October 8, 2004, Scottsdale sent a letter to Hamby confirming receipt of the notice of claim. The letter added that Scottsdale had yet to receive a copy of CIS's complaint, noted policy exclusions and definitions, and concluded that Scottsdale "is reserving the right to assert all defenses to coverage under the policy. . . . [Scottsdale] is not waiving any rights nor admitting any obligation under the policy." On April 21, 2005, at the latest, Scottsdale received a copy of the CIS complaint, which had been filed on July 31, 2002.

¶6. On June 29, 2006, Architex filed a "Third Party Complaint" against Scottsdale for failure "to provide Architex with defense and indemnity."[2] On July 25, 2006, Scottdale filed its answer and defenses seeking dismissal of Architex's "Third Party Complaint" with prejudice.[3] On September 6, 2006, Scottsdale formally denied Architex's demand for defense and indemnity, stating, *inter alia*, that "there has not been any 'occurrence' which would trigger" coverage.

---

[2] Architex filed three subsequent amended third party complaints. Notably, the "First Amended Third Party Complaint" added certain subcontractors as third-party defendants and sought a declaratory judgment that Scottsdale had a duty to defend and indemnify Architex under the policy. The "Third Amended Third Party Complaint" alleged "five additional counts against [Scottsdale], including: breach of contract, breach of duty to defend, bad faith refusal to indemnify, bad faith failure to investigate, and breach of duty of good faith and fair dealing."

[3] Scottsdale answered the amended third-party complaints in the same manner.

4

¶7.     Before the controversy erupted between CIS and Architex, Scottsdale had issued three consecutive one-year "Commercial Lines" policies to Architex. Each policy included a CGL part. The policies contained substantially similar language and collectively covered the period from June 29, 1999, to June 29, 2002. An "Extension of Supplemental Declarations" of the CGL part reveals that in exchange for CGL coverage, Architex paid premiums of $6,330 in 1999 and 2000, and $7,250 in 2001.[4]  Of these premiums, $3,705 in 1999 and 2000, and $4,233 in 2001, were for "Class Description: Contractors - Subcont Work - In Conn W/ Constr - Bldgs."[5]  The policies, as amended, provided, in pertinent part, that:

## SECTION I - COVERAGES

### COVERAGE A [-] BODILY INJURY AND PROPERTY DAMAGE LIABILITY

#### 1.  INSURING AGREEMENT

**a.**  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or *"property damage" to which this insurance applies. We will have the right and duty to defend the insured*

---

[4]The policies also provided liability coverage for non-owned autos, in exchange for separate premiums.

[5]The policies also included "Contractors Special Conditions," which stated that:

[y]ou will obtain certificates of insurance from all independent contractors providing evidence of:

> 1. Limits of [i]nsurance equal to or greater than the limits provided by this policy; and

> 2. Coverage equal to or greater than the coverages provided by this policy.

Failure to comply with this condition does not alter the coverage provided by this policy. However, should you fail to comply, a premium charge will be made.

5

*against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.* We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

> **(1)** The amount we will pay for damages is limited as described in Section III - Limits Of Insurance . . . .

. . .

**b.** *This insurance applies to* "bodily injury" and *"property damage"*[6] *only if*:

> **(1)** *The* "bodily injury" or *"property damage" is caused by an "occurrence"*[7] that takes place in the "coverage territory"; and

> **(2)** *The* "bodily injury" or *"property damage" occurs during the policy period* . . . .

. . .

## 2. EXCLUSIONS

This insurance does *not* apply to[:]

**a. Expected or Intended Injury**

"Bodily injury" or *"property damage" expected or intended from the standpoint of the insured.*

---

[6]The policy defines "property damage" as:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

[7]The policy defines "occurrence" as "*an accident,* including continuous or repeated exposure to substantially the same general harmful conditions." (Emphasis added.)

. . .

**j. Damage to Property**

"Property damage" to:

. . .

> **(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> **(6)** That particular part of any property that must be restored, repaired or replaced because "your work"[8] was incorrectly performed on it.

. . .

Paragraph (6) of this exclusion does *not* apply to "property damage" included in the "products-completed operations hazard."[9]

---

[8]The policy defines "your work" as:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

"Your work" includes:

**a**. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work" . . . .

[9]Regarding the "products-completed operations hazard," the policy states, in part, that it:

**a.** Includes all "bodily injury" and "*property damage*" occurring away from premises you own or rent and arising out of "your product" or "*your work*" *except*:

. . .

. . .

**l. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

*This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.*

**m. Damage to Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

> **(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>
> **(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

---

> **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
>
> > **(a)** When all of the work called for in your contract has been completed.
>
> . . .
>
> > **(c)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
>
> Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

(Emphasis added.)

8

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

> **(1)** "Your product";
>
> **(2)** "Your work"; or
>
> **(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

(Emphasis added.)

¶8.     On March 28, 2008, Architex filed a "Motion for Summary Judgment," asserting that:

> [CIS] claims property damage resulting from acts which were not intended by the insured, Architex. Therefore, there is an occurrence and Scottsdale's policy is triggered. At a minimum, some or all of [CIS's] allegations are arguably covered by the policy. Scottsdale therefore owes Architex a duty to defend as a matter of law.

Scottsdale responded with its own "Motion for Summary Judgment." Regarding non-bad-faith claims, Scottsdale maintained that it "does not have a duty to defend because . . . [t]he allegations contained in [CIS's] complaint, *as well as those which have claimed to have been asserted outside of the complaint*, do not constitute an 'occurrence' under the policy or are otherwise excluded from coverage." (Emphasis added.)

9

¶9.    Following a hearing, the circuit court[10] issued a "Bench Opinion Regarding Cross Motions for Summary Judgment." The circuit court held that "the type of damage, coverage for that damage, whether it was caused by a subcontractor, and all similar issues are moot on account of the meaning of other language in the policy." Specifically:

> this [c]ourt is convinced that this particular case is quite simple and that the controlling law on this policy language revolves around the word "*occurrence*." The controlling and/or strongly persuasive case law has defined plainly how that word is to be interpreted and applied. While it may be time for the [c]ourts of this state to expand that language and law so as to bring construction defects under the indemnity and defense obligations included in CGL policy language, this trial court is not at liberty to do so in the face of *binding precedent*.

(Emphasis added.) According to the circuit court, the:

> definition of "occurrence" being parsed by the [Mississippi] Supreme Court in [*United States Fidelity & Guaranty Company v. Omnibank*, 812 So. 2d 196 (Miss. 2002)] is *verbatim* identical to the language in the policy at issue here. In fact, all of the CGL Coverage Form language quoted in *Omnibank* and virtually every other case studied appears to be a *verbatim* recitation of the language at issue here.

(Emphasis in original.)

¶10.    In the non-construction-defect context of *Omnibank*, this Court found "that coverage does not apply to 'bodily injury' or 'property damage' that is expected or intended from the standpoint of the insured." *Omnibank*, 812 So. 2d at 199-200. In determining whether any "occurrence" exists, "[t]he *only relevant consideration* is whether, according to the declaration, the *chain of events leading to the injuries* complained of were *set in motion and followed a course consciously devised and controlled by [the insured] without the*

---

[10]Rankin County Court Judge Kent McDaniel was appointed as Special Judge in the case *sub judice* by order of the circuit court.

*unexpected intervention of any third person or extrinsic force.*" *Id*. at 200 (quoting *Allstate Ins. Co. v. Moulton*, 464 So. 2d 507, 509 (Miss. 1985)) (emphasis added).

¶11.    The circuit court's reliance on *Omnibank*'s definition of "occurrence," and the Fifth Circuit's "*Erie*-guess" application in *ACS Construction Company v. CGU*, 332 F.3d 885, 888-892 (5th Cir. 2003), concluded that:

> whatever work was improper or defective or was not completed, as alleged in the original complaint and via ensuing discovery, was nevertheless the result of intended action by the insured, Architex. Architex had a contract to build [the Inn]. It intentionally subcontracted the various portions of the work to others who entered contractual obligations to Architex. Architex undoubtedly did not intend for any of those subcontractors to do defective or improper work. However, the hiring of those subcontractors was not an "accident, including continuous or repeated exposure to substantially the same general harmful conditions" as the definition of "occurrence" sets out plainly in the insurance policy. Additionally, the hiring of the subs, was a "course consciously devised and controlled by [the insured]" which undeniably set in motion the "chain of events leading to the injuries complained of."

The circuit court ruled that "as coverage was never triggered, the [c]ourt must necessarily find that the duty to defend was likewise never triggered." In granting summary judgment in favor of Scottsdale, the circuit court "resolve[d] against Architex any claim that it has or had against Scottsdale on account of the CGL policy at issue whether arising as a claim under the policy or a claim for bad faith in any way related to Scottsdale's declination to indemnify and/or defend under the policy."

¶12.    On May 14, 2008, the circuit court entered its "Final Judgment Dismissing Third Amended Third Party Complaint." The final judgment specifically stated that "since there is no coverage, and correspondingly no duty to defend, as a matter of law Scottsdale cannot be held liable for its alleged failure to act in good faith and fair dealing, failure to investigate,

11

failure to abide by its own policies and procedures, and failure to abide by nationally-recognized industry standards." On June 12, 2008, Architex filed notice of appeal.

**ISSUE**

¶13. This Court will consider only the limited and narrow issue of:[11]

> Whether the circuit court erred in concluding, as a matter of law, that the intentional act of hiring subcontractors by the insured general contractor precludes the possibility of coverage.

**BACKGROUND**

¶14. Scottsdale's "Commercial General Liability Coverage Form," which contains the policy language quoted in ¶ 7 *supra*, provides at the bottom of each page "Copyright, Insurance Services Office, Inc. 1997." "The vast majority of general liability policies sold in this country utilize language drafted by the Insurance Services Office . . . ." David Dekker, Douglas Green, Stephen Palley, *The Expansion of Insurance Coverage for Defective Construction*, 28 Construction Lawyer 19, 19-20 (Fall 2008). These policies:

> begin with a broad grant of coverage, which is then limited in scope by exclusions. Exceptions to exclusions narrow the scope of the exclusion and, as a consequence, add back coverage. However, *it is the initial broad grant of coverage, not the exception to the exclusion, that ultimately creates (or does not create) the coverage sought*.

---

[11]Without filing a cross-appeal, Scottsdale raised the following issue in its Appellee's Brief, "[d]oes an insured violate the notice requirements of its policy by failing to notify its insurer of the existence of a lawsuit for more than two years while defending the suit on its own and tactically positioning its defense to the insurer's prejudice?" The circuit court expressly avoided addressing this issue in granting summary judgment to Scottsdale, stating "[t]his [c]ourt has not addressed a number of issues and bases urged upon the [c]ourt, e.g. whether notice of claim was timely made." As such, and without passing judgment on the merits of the issue, this Court concludes that the issue is not properly before this Court at this time.

*Id.* at 20 (emphasis added). *See also **Lamar Homes, Inc. v. Mid-Continent Cas. Co.***, 242 S.W.3d 1, 10 (Tex. 2007) (quoting ***Weedo v. Stone-E-Brick, Inc.***, 81 N.J. 233, 405 A.2d 788, 790 (1979)) ("[t]he CGL's insuring agreement grants the insured broad coverage for property damage and bodily injury liability, which is then narrowed by exclusions that 'restrict and shape the coverage otherwise afforded'").

¶15.   Given the nature of these policies, the subject "coverage litigation often boils down to a dispute first over the meaning of the word 'accident' within the definition of 'occurrence' and then the scope and application of the 'your work' exclusion." Dekker, et al., *The Expansion of Insurance Coverage for Defective Construction*, 28 Construction Lawyer at 20.  In the absence of an "occurrence," there is no coverage. *See **U.S. Fire Ins. Co. v. J.S.U.B., Inc.***, 979 So. 2d 871, 880 (Fla. 2007) ("the subcontractor's exception to the general exclusion for a contractor's defective work becomes important only if there is coverage under the initial insuring provision").

¶16.   There is a clear jurisdictional split regarding whether defective subcontractor construction constitutes an "occurrence" under a CGL policy. *See **Gen. Sec. Indem. Co. of Ariz. v. Mountain States Mut. Cas. Co.***, 205 P.3d 529, 535 (Colo. Ct. App. 2009) (examples noted); ***J.S.U.B.***, 979 So. 2d at 885-86 (examples noted); ***Lamar Homes***, 242 S.W.3d at 5-6 n.2 & 3 (examples noted); Dekker, et al., *The Expansion of Insurance Coverage for Defective Construction*, 28 Construction Lawyer at 23 nn.25 & 26 (examples noted).  The Supreme Court of Kansas has explained the opposing views, as follows:

> one line of cases has held that faulty or improper construction does not constitute an accident; rather, the damage is the natural and ordinary

consequence of the insured's act.[12]  The other line of cases has held that improper or faulty construction does constitute an accident as long as the resulting damage is an event that occurs without the insured's expectation or foresight.[13]

*Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 281 Kan. 844, 137 P.3d 486, 491 (2006).

---

[12]A policy justification adopting this view was employed in the circuit court's reasoning that general contractors should bear the responsibility for properly selecting and supervising subcontractors; and that to hold otherwise would both transform the policy into a performance bond and risk creating moral hazard on the part of general contractors, thereby providing an unjustified windfall to said general contractors.

[13]The espoused policy justifications for this view include that it comports with the policy language and that "if the insurer decides that this is a risk it does not want to insure, it can clearly amend the policy to exclude coverage, as can be done simply by either eliminating the subcontractor exception or adding a breach of contract exclusion[,]" *J.S.U.B.*, 979 So. 2d at 891; that "the fact that the general contractor receives coverage will not relieve the subcontractor of ultimate liability . . . [as] an insurer will have subrogation rights against the subcontractor who performed the defective work[,]" *O'Shaughnessy v. Smuckler Corp.*, 543 N.W.2d 99, 102 (Minn. Ct. App. 1996), *abrogated on other grounds by Gordon v. Microsoft Corp.*, 645 N.W.2d 393 (Minn. 2002); and that an insurance policy is distinguishable from a performance bond insofar as "an insurance policy spreads the contractor's risk while a bond guarantees its performance[, and] . . . [u]nlike insurance, the performance bond offers no indemnity for the contractor; it protects only the owner." *Lamar Homes*, 242 S.W.3d at 10 n.7.

ANALYSIS

¶17.  We find the appropriate analysis should not be driven by policy justifications, but rather should be confined to the policy language.  The policy either affords coverage or not, based upon application of the policy language to the facts presented.  *See Corban v. United Servs. Auto. Ass'n*, 20 So. 3d 601, 609 (Miss. 2009).  The second consideration is that neither faulty or improper construction, nor defective workmanship (or gaining knowledge of same) constitutes an "occurrence," as defined in the policy.  The aforementioned are typically the result of either accidental or intentional acts.  These CGL policies are designed to provide liability protection for the general contractor and their subcontractors for accidental, inadvertent acts which breach accepted duties and proximately cause damage to a person or property.

¶18.  This Court has stated that:

> [t]he circuit court's grant [or denial] of a motion for summary judgment is reviewed by this Court de novo.  *See Wilner v. White*, 929 So. 2d 315, 318 (Miss. 2006). . . .  In this Court's de novo review, "[t]he evidence must be viewed in the light most favorable to the party against whom the motion has been made." *Daniels v. GNB, Inc.*, 629 So. 2d 595, 599 (Miss. 1993) (citation omitted).

*Kilhullen v. Kan. City S. Ry.*, 8 So. 3d 168, 174 (Miss. 2009).  *See also Corban*, 20 So. 3d at 609 (the interpretation of an insurance policy is a question of law to which a de novo standard of review applies).

¶19.  Architex maintains that:

> [CIS's] allegations . . . include claims of insufficient rebar in the foundation causing structural damage, insufficient water barriers leading to leaks in the walls of the facility, rusted metal in the [Inn's] pool, and the resulting mold and mildew claims.  These allegations, if proven true, are all unexpected from

15

Architex's standpoint and therefore constitute an occurrence according to the terms of the contract.[14]

Architex adds that Scottsdale has "accepted premium payments for subcontractor coverage for years," but "now attempts to deny Architex the benefit of its bargain by claiming that defective subcontractor work is intentional, and contending that a subcontractor's work becomes the general contractor's work, i.e. 'your work,' which is excluded under the contract." Therefore, Architex maintains that "[t]he relevant act is not simply subcontracting. Rather, the 'act' . . . is improperly placing rebar and knocking off a false chimney (which led to water damage to the [Inn]). These acts were accidental, not intentional." Architex argues the interpretation advocated by Scottsdale and the circuit court "completely negates any incentive for a contractor to purchase insurance."

¶20.    By contrast, Scottsdale contends there is no "occurrence," as "[f]ailing to install rebar in a building is not an accident. Defective construction work that causes mold, rust, or water leaks likewise is not an accident." As to the subcontractor premium referenced by Architex, Scottsdale argues that it "means only that that [p]olicy takes into account that subcontractors

---

[14]There is no evidence in the record that CIS has filed an amended complaint against Architex including such claims. Generally, "[t]he obligation of the insurer to defend is to be determined by analyzing the allegations of the complaint or declaration in the underlying action." ***Omnibank***, 812 So. 2d at 200. However, if the "insured learns . . . that the true facts, if established, present potential liability of insured, [the] insurer must defend until it appears that facts upon which liability is predicated exclude insurance coverage." ***Mavar Shrimp & Oyster Co. v. U.S. Fid. & Guar. Co.***, 187 So. 2d 871, 875 (Miss. 1966) (quoting ***Crum v. Anchor Cas. Co.***, 264 Minn. 373, 119 N.W.2d 703 (1963)). Scottsdale's expert, Jeffrey Jackson, acknowledges situations arise when "there can be circumstances in litigations that would give rise to a duty to defend . . . in a case for a claim that wasn't originally required to be defended."

will be working on the hotel construction project, and that they have their own insurance. Because the subcontractors had their own insurance, Architex's premium was reduced."

¶21. Beginning with the premise that Scottsdale's duties are defined by the terms of the policy, we consider the policy language through the lens of the substantive contract law of this state, which includes the following concepts:

> if a contract is *clear and unambiguous*, then it must be *interpreted as written*. A policy must be *considered as a whole, with all relevant clauses together*. If a contract contains ambiguous or unclear language, then ambiguities must be resolved in favor of the non-drafting party. Ambiguities exist when a policy can be logically interpreted in two or more ways, where one logical interpretation provides for coverage. However, ambiguities do not exist simply because two parties disagree over the interpretation of a policy. Exclusions and limitations on coverage are also construed in favor of the insured. Language in exclusionary clauses must be "clear and unmistakable," as those clauses are strictly interpreted. Nevertheless, "a court must refrain from altering or changing a policy where terms are unambiguous, despite resulting hardship on the insured."

*U.S. Fid. & Guar. Co. v. Martin*, 998 So. 2d 956, 963 (Miss. 2008) (internal citations omitted) (emphasis added). The burden of proving coverage rests with the insured. *See So. Life & Health Ins. Co. v. Kemp*, 300 So. 2d 782, 785 (Miss. 1974).

¶22. The policies at issue define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." This Court has previously addressed the meaning of similar and identical definitions of "occurrence" in the factually distinguishable cases of *Moulton* and *Omnibank*, respectively.

¶23. In *Moulton*, this Court considered whether, under a comprehensive dwelling policy, an insurer was obligated to defend and indemnify an insured in an action against the insured for malicious prosecution. *See Moulton*, 464 So. 2d at 508. The policy provided, in

17

pertinent part, that "[t]he Company will pay on behalf of the insured all sums which the Insured shall become legally obligated to pay as damages because of *bodily injury or property damage to which this insurance applies, caused by an occurrence*[,]" and defined "occurrence" as "*an accident*, including injurious exposure to conditions, which results, during the endorsement period, *in bodily injury or property damage neither expected nor intended from the standpoint of the Insured . . . .*" **Id**. (emphasis added). Regarding an "accident," this Court found that "[t]he *only relevant consideration* is whether, according to the Declaration, the *chain of events leading to the injuries* complained of was *set in motion and followed a course consciously devised and controlled by appellant without the unexpected intervention of any third person or extrinsic force.*" **Id**. at 509 (quoting **Winkler v. Ohio Cas. Ins. Co.**, 51 Md. App. 190, 441 A.2d 1129, 1132 (1982)) (emphasis added). As such, this Court determined that:

> the *contract* is *sufficiently unambiguous* for us to hold that the term *accident refers to Mrs. Moulton's action* and *not whatever unintended damages flowed from that act.*
>
> Mrs. Moulton obviously intended to swear out the complaint against Anthony Walls. Although she may not have intended for him to suffer humiliation or embarrassment, she certainly intended for him to be arrested. By requiring Allstate to defend and indemnify Mrs. Moulton, this Court would have stretched the meaning of accident beyond the bounds of that normally used in the English language and certainly beyond the bounds of the use intended within the policy.

**Moulton**, 464 So. 2d at 510 (emphasis added).

¶24.    In **Omnibank**, an individual financed her car purchase through Omnibank, but failed to obtain car insurance, as required by Omnibank. *See* **Omnibank**, 812 So. 2d at 197-98. Subsequently, Omnibank "allegedly 'force-placed' insurance coverage on the car and

18

charged and added to the amount of loan the premiums and interest." *Id*. at 198. After the individual filed suit in federal court against Omnibank for "wrongfully force-plac[ing] collateral protection insurance," Omnibank filed a third-party complaint against its insurer, United States Fidelity & Guaranty Company ("USF&G"), for breaching its duty to defend and bad faith. *Id*. Subsequently, the district court granted USF&G's motion for summary judgment as to the bad-faith claim, but denied the motion regarding the duty-to-defend claim. *See id*. After USF&G appealed, the Fifth Circuit certified the following question to this Court, "whether, under Mississippi law, an insurer's duty to defend under a *general commercial liability policy* for injuries caused by accidents extends to *injuries unintended by the insured but which resulted from intentional actions of the insured if those actions were negligent* but not intentionally tortious." *Id*. at 197-98 (emphasis added). Addressing policy language with substantively similar coverage provisions, "occurrence" definitions, and "expected or intended injury" exclusions as those in the case *sub judice*, this Court found such language unambiguous and, applying the "occurrence" interpretation from *Moulton*, determined that:

> Omnibank intended to make a loan to Ramsey, intended to require Ramsey to maintain insurance, intended to place [a] collateral protection insurance provision in the loan agreement, and intended to include the premium in the finance charge. This chain of events was set in motion and followed a course consciously devised and controlled by Omnibank, without the unexpected intervention of any third person or extrinsic force. Clearly, under the rationale of *Moulton*, USF&G is under no duty to defend . . . .

*Id*. at 200-01. By virtue of the policy language, "even if an insured acts in a negligent manner, that *action must* still be *accidental and unintended* in order to implicate policy coverage." *Id*. at 197 (emphasis added). This Court added that "a claim resulting from

19

intentional conduct which causes foreseeable harm is not covered, even where the actual injury or damages are greater than expected or intended." *Id*. at 201 (citations omitted). In sum, this Court answered the certified question by stating that "an insurer's duty to defend under a *general commercial liability policy* does *not* extend to *negligent actions* that are *intentionally caused by the insured*." *Id*. at 202 (emphasis added).

¶25. Unlike in this case, the insureds in both *Moulton* and *Omnibank* were the parties who engaged in intentional and allegedly tortious conduct leading to the injuries complained of. Thus, the insured's intentional actions did not constitute "accidents," and the damages resulting therefrom did not amount to "occurrences" under the respective policies. In the present case, by contrast, the only act or conduct considered by the circuit court was the hiring of subcontractors, without consideration of whether the underlying acts or conduct of the insured or the subcontractors proximately causing "property damage" were negligent or intentional or were otherwise excluded by policy language. While the alleged "property damage" may have been "set in motion" by Architex's intentional hiring of the subcontractors,[15] the "chain of events" may not have "followed a course consciously devised and controlled by [Architex], without the unexpected intervention of any third person or extrinsic force." *Id*. at 200-01.

¶26. The Fifth Circuit's application of *Moulton* and *Omnibank* principles in *ACS* is incongruent with the *raison d'etre* for procuring liability protection, whether the nature of

---

[15]In the record before us, we have not discerned a claim of negligent hiring or entrustment (for example, hiring a plumber for electrical contract work or hiring a thrice-convicted burglar for security services, etc.).

such coverage be auto, home, or business liability insurance. *See ACS*, 332 F.3d at 885. In *ACS*, the United States Army Corp of Engineers entered into a contract with ACS for the construction of munitions bunkers at an Air Force base. *See id*. at 887. ACS then hired a subcontractor "to install a waterproofing membrane to the roofs." *Id*. Following installation, leaks developed in the roofs, and ACS was unsuccessful in getting the subcontractor to make corrections. *See id*. "As ACS was still responsible for the project, it was forced to make the repairs thereby suffering a loss in excess of $190,000." *Id*. Thereafter, ACS filed a claim with its CGL insurer. *See id*. The subject policy included nearly identical coverage provisions; "occurrence" and "your work" definitions; and "expected or intended injury," "damage to property," and "damage to your work" exclusions as those in the case *sub judice*. *See id* at 887, 892. The CGL insurer denied ACS's claim on the basis that "no 'property damage' caused by an 'occurrence' took place . . . ." *Id*. at 887. After ACS filed suit against its CGL insurer, the district court granted summary judgment in favor of the insurer, "finding that there was no 'occurrence' such that ACS was entitled to recovery under the policy." *Id*. On appeal, the Fifth Circuit considered "whether, under Mississippi law, an 'accident' refers to the unintended consequences of installing the waterproofing membrane or whether an 'accident' refers to the underlying acts of the installation itself." *Id*. at 888. The Fifth Circuit concluded that the policy language was unambiguous and that "in a CGL insurance policy which defines an 'occurrence' as an 'accident,' coverage is [*not*] triggered if the *underlying act* was *intentional and deliberate*[,]" nor does coverage extend to the "*unintended consequences*" of such an underlying act. *Id*. at 890, 892 (emphasis added). Based thereon, the Fifth Circuit found that:

21

> no "occurrence" took place. The negligence in installing the waterproofing membrane in the roofs was the foreseeable cause of the leaks that developed. The act of installing the waterproofing membrane fell outside of the terms of the policy because regardless of whether prompted by negligence (1) ACS's acts were committed deliberately and the intervention of [the subcontractor] to complete the work was expected; and (2) the likely (and actual) leaking that developed as a result of faulty workmanship was within ACS's foresight. The faulty workmanship of [the subcontractor] unfortunately amounts to negligence. Hiring the subcontractors and installing the waterproofing membranes were not accidents under the terms of the policy.

*Id*. at 891 (emphasis added). As to the "subcontractor exception" to the "damage to your work" exclusion, the Fifth Circuit summarily cited **Omnibank** in concluding that "[t]he exclusionary language in the contract cannot be used to create coverage where none exists." *Id*. at 892.

¶27.   Preliminarily, this Court agrees with **ACS** that "exclusionary language . . . cannot be used to create coverage where none exists." **ACS**, 332 F.3d at 892. However, this proposition does not preclude considering the policy "as a whole." **Martin**, 998 So. 2d at 863. The policy exclusions and exceptions thereto can be (and often are) valuable in determining the parameters of coverage, generally, and the meaning of "accident" within the definition of "occurrence," specifically. As the Fourth Circuit Court of Appeals has stated:

> [t]he import of the "your work" exclusion and its subcontractor exception is not that the exclusion "creates" coverage. Rather, the import is that the exception lends insight into the baseline definition of "occurrence" from which parties and courts interpreting CGL policies should operate. *If the definition of "occurrence" cannot be understood to include an insured's faulty workmanship, an exclusion that exempts from coverage any damage the insured's faulty workmanship causes to its own work is nugatory*. If, on the other hand, the definition of "occurrence" does include an insured's faulty workmanship, such an exclusion functions as a meaningful "limitation or restriction on the insuring clause."

***Stanley Martin Co. v. Ohio Cas. Group***, 313 F. App'x 609, 613 n.2 (4th Cir. 2009) (internal

citation omitted) (emphasis added). Similarly, the Supreme Court of Florida has provided

that:

> if the insuring provisions do not confer an initial grant of coverage for faulty
> workmanship, there would be no reason for [the insurer] to exclude damage to
> "your work[.]"
>
> . . .
>
> In addition, *a construction of the insuring agreement that precludes recovery
> for damage caused to the completed project by the subcontractor's defective
> work renders the "products-completed operations hazard" exception to
> exclusion (j)(6) and the subcontractor exception to exclusion (l) meaningless*.
>
> . . .
>
> *Reading these provisions in pari materia with the insuring agreement supports
> the conclusion that a subcontractor's defective work that results in damage to
> the completed project can constitute an "occurrence."*

***J.S.U.B.***, 979 So. 2d at 886-87 (emphasis added). In short, if an "occurrence" is a condition

precedent to coverage, but "personal injury" or "property damage," if proximately caused by

a negligent act or conduct of a subcontractor, is not covered, then there is no logical

explanation for why the policy contains the referenced exclusions and exceptions to

exclusions (e.g., the "subcontractor exception").

¶28. It appears that part of the confusion between insurers and insureds, and in conflicting

opinions of courts, is caused by branding faulty workmanship, defective work, and other

similar phrases as "occurrences" or not. Faulty workmanship, defective work, et al., may be

accidental, intentional, or neither. A return to basics leads this Court to conclude that the

underlying facts will determine whether the complaint of "property damage" (defective or

23

faulty workmanship) was proximately caused by breach of a recognizable duty and whether that breach was accidental or intentional; or, whether the "property damage" was caused by neither. In two of the three aforementioned scenarios, no coverage would exist. Only when "property damage" is proximately caused by an accident (an inadvertent act) does an "occurrence," as defined by the policy, trigger coverage. The record before us is insufficiently developed to answer that question with certainty.

¶29. Plainly, an interpretation of the policy which views the term "occurrence" categorically to preclude coverage for the simple negligence of a subcontractor subverts the plain language and purpose of the CGL part of these policies. For example, if a roofing subcontractor negligently causes a roofing tile to fall, injuring a passerby, does such an inadvertent act on the part of the subcontractor automatically defeat coverage simply because the subcontractor was intentionally hired by the insured-general contractor? Could one legitimately argue, as a matter of law, that the "bodily injury" resulting therefrom was "expected or intended from the standpoint of the insured?" We hold it does not.[16] This Court adds that even if there has been "property damage" caused by an "occurrence," coverage is not automatic. It also must be ascertained, under the facts specific to each case, if any other exclusions and/or exceptions to exclusions apply.

---

[16]As argued by amicus:

[a] construction contractor's simple intent to engage a subcontractor, and quite possibly one with special expertise, is quite different from the intent necessary to deprive that contractor of its CGL insurance coverage for accidents taking place when things go awry in the course of its business. Any effort to equate the two would be contrary to the terms of the CGL policy itself.

¶30.  Architex incurred specific premium charges for "Class Description: Contractors - Subcont Work - In Conn W/ Constr - Bldgs."  The parties dispute the purpose of these premium payments.  Hamby's affidavit states that Charles Roberts, the Vice President of the Underwriting Division at Southern Insurance Underwriters,[17] explained "Scottsdale's rationale behind collecting premiums was 'to ensure that adequate premium is collected to provide coverage for the general contractor's defense should they be named in a lawsuit involving a covered loss resulting from the actions of a subcontractor.'"  The affidavit of Elizabeth Baxter, Scottsdale's Regional Underwriting Manager for the Southeast Region, provides that:

> [i]t is . . . a misinterpretation of the Program Documents to contend that because the work of subcontractors is considered in determining the premium charged for a policy that all work of subcontractors is, therefore, covered by the policy.
>
> . . .
>
> Additional premium is charged for a general contractor's policy if the general contractor has subcontractors on his project because the potential liability of the general contractor is increased by additional persons and entities working on the project.
>
> . . .
>
> In this case, Architex's premium was actually reduced by the fact that the subcontractors had their own coverage.

The fact that subcontractors had their own insurance coverage does not, in itself, determine whether Architex had coverage for this claim.[18]

---

[17]The underwriter for the CGL policies at issue.

[18]Depending on other insurance clauses in all policies providing coverage, the order of payment may be affected.

¶31. Given that this appeal was filed after summary judgment was granted for Scottsdale, this evidence must be viewed in the light most favorable to Architex. *See Kilhullen*, 8 So. 3d at 174. Accordingly, this Court finds that the referenced premium payments support coverage for Architex as to unexpected and unintended "property damage" resulting from work "performed on [its] behalf by a subcontractor." This further comports with a prior ruling of this Court, in the context of uninsured-motorist coverage, that a presumption of equal coverage exists if the insurer charges a separate premium for such coverage over the regular coverage and that "in order to limit this coverage it must be done in such clear and unambiguous language that it may be readily seen and understood by the insured that the coverage is limited." *Hartford Accident & Indem. Co. v. Bridges*, 350 So. 2d 1379, 1381 (Miss. 1977). This Court finds no such "clear and unambiguous language" limiting coverage for Architex as to unexpected or unintended "property damage" resulting from work "performed on [its] behalf by a subcontractor." In fact, as discussed in ¶ 27 *supra*, the policy expressly includes such coverage.

¶32. Therefore, by virtue of the clear and unambiguous language of the policy,[19] as well as the subcontractor premiums paid by Architex, this Court finds *Omnibank* distinguishable. The Fifth Circuit's reliance thereon in *ACS* is inconsistent with Mississippi law and, therefore, inapplicable. The subject policy *unambiguously* extends coverage to Architex for unexpected or unintended "property damage" resulting from negligent acts or conduct of a subcontractor, if not excluded by other applicable terms and conditions of the policy not at

---

[19]In common jargon, "it is what it is."

issue in this appeal. By failing to consider the policy as a whole, the circuit court erred in its "occurrence" analysis. Under Scottsdale's CGL policy, the term "occurrence" cannot be construed in such a manner as to preclude coverage for unexpected or unintended "property damage" resulting from work "performed on [Architex's] behalf by a subcontractor." As the circuit court's summary judgment rulings on Scottsdale's duties were premised upon the absence of coverage, this Court reverses and remands this case for further proceedings consistent with this opinion.

## CONCLUSION

¶33. This Court concludes that under Scottsdale's CGL policy, the term "occurrence" cannot be construed in such a manner as to preclude coverage for unexpected or unintended "property damage" resulting from negligent acts or conduct of a subcontractor, unless otherwise excluded or the insured breaches its duties after loss. As such, the circuit court erred in granting summary judgment to Scottsdale on the basis that there was no "occurrence" and, thus, no coverage under the subject policy. This case is reversed and remanded for further proceedings consistent with this opinion.

¶34. **REVERSED AND REMANDED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., DICKINSON, LAMAR, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR.**

27