MAXWELL, J.,
for the Court:
¶ 1. Noble Real Estate (Noble) hired subcontractor Harris Construction Company (Harris) to perform dirt work and site preparation for a new home Noble was building. As part of Noble and Harris’s agreement, Harris obtained an additional-insured endorsement to its commercial general liability (CGL) insurance policy with Ohio Casualty Insurance and named Noble as an additional insured. But the insurance provided under the endorsement was “limited.” The coverage “only” applied to “liability ... caused in whole or in part by [Harris’s] ongoing operations performed for [Noble].”
¶2. Harris’s “ongoing operations” performed for Noble ended in March 2006. Afterwards, Noble built a house on the site, which it sold in September 2007. Before closing, the homeowners noticed cracks in the home, but purchased it anyway. When the cracks got worse, they sued Noble. As part of their claim, they alleged foundation issues related to faulty dirt work.
¶ 3. Noble now claims Ohio Casualty owed it a duty to defend the homeowners’ lawsuit and indemnify Noble for any liability, based on the additional-insured endorsement. But the endorsement protected Noble against lawsuits arising out of accidents occurring during the time Harris performed dirt work — it was not a performance bond guaranteeing Harris’s dirt work. Because the endorsement was clear that it only covered liability that arose from “ongoing operations,” and because the homeowners’ damage did not arise until well after Harris had completed its operations, the homeowners’ claims against Noble did not trigger coverage under the additional-insured endorsement.
¶ 4. For these reasons, the circuit court properly granted Ohio Casualty summary judgment on Noble’s coverage-based claims. We also find summary judgment was properly granted in favor of all three defendants for the remainder of Noble’s claims. Thus, we affirm.
Background Facts and Procedural History
I. Certificate of Insurance
¶ 5. For years, Noble had used Harris as a subcontractor for its dirt work and site preparation. Noble asked Harris to list it *717 as an additional insured on Harris’s CGL policy. So Harris worked with its insurance agent, William D. Horne of Wellington Associates, Inc., to obtain an additional-insured endorsement.
¶ 6. The endorsement limited the insurance provided to the additional insured to “liability ... [c]aused in whole or in part by [Harris’s] ongoing operations performed for that insured.” The endorsement further limited coverage, expressly excluding “ ‘property damage’ occurring after”:
(1) All work ... on the project ... [was] performed by or on behalf of the additional insured[s] at the site where the covered operations have been completed; or
(2) That portion of “your [ (Harris’s) ] work” out of which the ... damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project.
¶ 7. Wellington Associates sent Noble a certifícate of insurance. The certificate informed Noble that it, as “certificate holder,” was a “named Additional Insured in regard to General Liability required by written contract.” The certificate explicitly stated it was being issued for Noble’s information only, did not confer on Noble any rights, and did not alter coverage under Harris’s general liability policy. Neither Horne nor anyone else at Wellington Associates had any other contact with Noble.
II. Salyers’ House
¶ 8. In the spring of 2006, Harris prepared a site for Noble to build a home in Madison, Mississippi. Harris completed the work by March 9, 2006. After Noble had an engineer inspect Harris’s dirt work to ensure it met or exceeded industry standards, Noble then built a house on the site. Once the house was completed, the City of Madison inspected the home and issued a certificate of occupancy. Noble then marketed the home for sale.
¶ 9. More than a year and a half after Harris had completed its work, on September 14, 2007, the Salyers entered a contract to purchase the home. But the Sal-yers noticed cracks in the home, so they had an engineer perform a structural analysis. Because the engineer concluded the home had no foundation problems — despite trim separation, cracks in the mortar, and uneven doors — the Salyers went through with the purchase.
¶ 10. But after they moved in, they noticed the problems were worse. A second engineer determined there were foundation problems, partially linked to the fill dirt beneath the slab. After having to pay another contractor to shore up the foundation, the Salyers sued Noble[1] for economic and emotional-distress damages.
III. Noble’s Lawsuits
¶ 11. Noble sought a defense and indemnity under its own CGL policy. But Noble’s insurer denied coverage and filed a declaratory action in federal court. Noble countersued and included its own insurance agent and agency as third-party defendants. Noble[2] then filed a separate *718 lawsuit in Madison County Circuit Court against Harris’s insurance agent and agency, Horne and Wellington Associates. Noble claimed, based on the certificate of insurance, it reasonably and detrimentally relied on the fact the additional-insured endorsement provided coverage for the Salyers’ claim.
1112. After the federal suit ended with summary judgment being granted in favor of all three of Noble’s adversaries, Noble then amended his state-court complaint to add Harris’s insurance company, Ohio Casualty. In addition to claiming breach of contract and bad faith, Noble took the alternative position that Ohio Casualty was bound to provide coverage — even if there was no coverage under the additional-insured endorsement — because Noble reasonably believed there was coverage based on Ohio Casualty’s previous actions connected to a lawsuit against Harris and Noble concerning another Noble-built house.
¶ 13. The Madison County Circuit Court granted all three defendants summary judgment on all of Noble’s claims. The circuit judge found, based on the undisputed facts, that there was no coverage under the additional-insured endorsement for the Salyers’ property-damage claim against Noble. The endorsement only covered liability for property damage caused by Harris’s “ongoing operations.” So when Harris completed its dirt work in March 2006, Noble’s coverage under the endorsement also ended. As the Salyers’ damage did not arise until much later— after Noble built and sold the house — it was not covered.
¶ 14. And because there was no coverage, the circuit judge found all of Noble’s remaining claims also failed. Having disposed of all claims against all parties, the circuit judge entered a final, appealable judgment in July 2012. Noble timely appealed.
Discussion
¶ 15. We review the grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. Bradley v. Kelley Bros. Contractors, Inc., 117 So.3d 331, 336 (¶ 21) (Miss.Ct.App.2013) (citation omitted). In doing so, we ask the same question as the circuit judge — did the moving parties show that there are no material factual disputes and that they are entitled to judgments as a matter of law. Id.
¶ 16. Our de novo review leads us to the same conclusions as the circuit judge. As a matter of law, the additional-insured endorsement does not cover the Salyers’ claims against Noble because the Salyers’ alleged property damage was not caused by Harris’s “ongoing operations.” Further, Noble has failed to meet his burden of production for any other claim against Ohio Casualty, Horne, or Wellington Associates. See Karpinsky v. Am. Nat’l Ins., 109 So.3d 84, 88-89 (¶ 11) (Miss.2013) (holding that party who bears the burden of proof at trial bears the burden of production at the summary-judgment stage).
I. No Coverage Under the Additional-Insured Endorsement
¶ 17. Noble brought a claim of breach of contract against Ohio Casualty, as well as derivative claims of breach of the duty of good faith and fair dealing and bad faith. Interestingly, it is the “certificate of insurance” that Noble asserts Ohio Casualty breached. But this cannot be so. The certificate clearly stated it was being *719 issued for Noble’s information only and neither conferred nor altered any rights in and of itself. So if Ohio Casualty owed Noble any contractual duty, such a duty would be found in the additional-insured endorsement. Because the additional-insured endorsement did not cover Noble’s liability connected to the Salyers’ lawsuit, we agree with the circuit judge that all of Noble’s contract-based claims against Ohio Casualty fail.
A. Interpreting “Ongoing Operations ”
¶ 18. Both Noble and Ohio Casualty agree that Noble was “only an additional insured with respect to liability ... caused in whole or in part by [Harris’s] ongoing operations[.]” But they disagree on the meaning of “ongoing operations” as a limitation to coverage.
¶ 19. The scope of coverage of an insurance policy is a question of law, not of fact, so this issue was appropriate for summary judgment. See Shelter Mut. Ins. v. Simmons, 543 F.Supp.2d 582, 585 (S.D.Miss.2008) (citing Noxubee Cnty. Sch. Dist. v. United Nat’l Ins., 883 So.2d 1159, 1165 (¶ 13) (Miss.2004)). “[I]f a contract is clear and unambiguous, then it must be interpreted as written.” Architex Ass’n, Inc. v. Scottsdale Ins., 27 So.3d 1148, 1157 (¶ 21) (Miss.2010) (quoting U.S. Fid. & Guar. Co. v. Martin, 998 So.2d 956, 963 (¶ 13) (Miss.2008)). And just because the parties disagree over how to interpret policy language does not mean the language is ambiguous. Id.
¶ 20. Harris’s CGL policy does not define “ongoing operations.” And neither our supreme court nor this court has had occasion to interpret this phrase as it is used in an additional-insured endorsement to a CGL policy. But other jurisdictions have interpreted “ongoing operations” in similarly worded endorsements. After reviewing these precedents, we are persuaded by the courts that have found that, in order for “ongoing operations” to have any meaning, it cannot encompass liability arising after the subcontractor’s work was completed. E.g., United Fire & Cas. Co. v. Boulder Plaza Residential, LLC, 633 F.3d 951, 958-59 (10th Cir.2011); Weitz Co., LLC v. Mid-Century Ins. Co., 181 P.3d 309, 313-15 (Colo.Ct.App.2007); Hartford Ins. v. Ohio Cas. Ins., 145 Wash.App. 765, 189 P.3d 195, 201-02 (2008).
¶21. Giving “ongoing operations” its plain and ordinary meaning, the Colorado Court of Appeals found this phrase referred to an action “actually in process.” Weitz, 181 P.3d at 313 (quoting Webster’s Third New International Dictionary 1576 (2002)). Thus, this phrase, by definition, could not encompass “completed operations.” Id. at 313-14. Because in Weitz the contractor had been sued for damage that was caused by the subcontractor’s completed work, the insurer had no duty to defend or indemnify the general contractor. Id. at 315.
¶ 22. The Tenth Circuit, applying Weitz, further explained, because “[clover-age for ‘ongoing operations’ is distinct from coverage for ‘completed operations’ or ‘completed work,’ ” when a policy “only’ covers “Ongoing operations,” the “result [is a] more limited coverage for the additional insured general contractor vis-vis the insured contractor.” Boulder Plaza, 633 F.3d at 958-59 (quoting Weitz, 181 P.3d at 313). And to reach back to “the date of the earliest beginning of any prior event which might be regarded as having a causal relation to the unlooked for mishap would introduce ambiguity where none now exists.” Boulder Plaza, 633 F.3d at 959. By limiting coverage to property damage caused by “ongoing operations,” the policy is clear that once a subcontractor completes its work, coverage ends. Id.
*720 ¶ 23. The Tenth Circuit found that to hold otherwise — and agree with the contractor’s suggested interpretation that the damage merely has to be causally linked to operations that were once ongoing — would “transform [the] commercial general liability policy into a performance bond.” Id. But CGL policies are not meant to cover the business risk that the subcontractor’s performance may be inadequate. Id. Rather, the purpose of a CGL policy is to protect businesses from liability to third parties for bodily injury or property damage resulting from accidents.
B. Noble’s Argument
¶ 24. When Harris completed its operations for Noble in March 2006, there was no liability — because there was no house yet that could have been damaged. So the damage for which the Salyers sought to hold Noble accountable could in no way have been caused by Harris’s operations “actually in process.” Weitz, 181 P.3d at 313. Instead, it was caused by Harris’s completed work.
¶ 25. Noble tries to argue that the phrase “caused ... by [Harris’s] ongoing operations” is a “causal” limitation, not a “temporal” limitation on coverage. Noble insists the only time limit the endorsement places on coverage is the express exclusion of property damage “occurring after” all work on the project has been completed or that portion of Harris’s work had been put to its intended use. And it suggests that time had not passed when the cracks in the Salyers’ house began to form.
¶ 26. As Noble sees it, if the damage can be traced back to Harris’s active operations, the endorsement covers it. But to accept Noble’s argument, we would have to read the word “ongoing” out of the endorsement and find that Noble is covered for liability caused by Harris’s operations — active or completed. And “a court must refrain from altering or changing a policy where terms are unambiguous[.]” Architex, 27 So.3d at 1157 (¶ 21) (quoting Martin, 998 So.2d at 963 (¶ 13)). So we will not manipulate the endorsement to expand coverage that is clearly and unambiguously limited to liability caused by “ongoing operations.”
¶ 27. Further, Noble’s same argument was rejected by the Tenth Circuit in Boulder Plaza. See Boulder Plaza, 633 F.3d at 959. Were we to interpret the endorsement without giving effect to the unambiguous phrase “ongoing operations,” we would be changing Harris’s CGL policy to a performance bond, covering any and all liability in connection with Harris’s performance as subcontractor. See id. Not only does this interpretation contradict the plain and unambiguous language of the endorsement — that Noble’s status as an additional insured is “limited” to “only” liability caused by “ongoing operations”— but Noble has conceded that the endorsement is not a performance bond.
¶ 28. Here, it is clear from the language of the endorsement that Noble was only an additional insured for liability caused by Harris’s active work on the site. What this means is Noble was protected against lawsuits arising from accidents occurring during the time Harris performed dirt work. Had Harris accidentally knocked over a neighbor’s tree with a bulldozer or cut a gas line while performing dirt work, Noble would be covered for any resulting liability.
¶ 29. It is equally clear the endorsement did not cover property damage manifesting itself after Harris stopped working on the site. Noble does not dispute that Harris ceased its “ongoing operations” in March 2006. The Salyers did not form a contract to buy the later-built house until September 2007. So if Harris’s performance caused, even in part, the property damage for which Noble was liable, the *721 cause was Harris’s completed work, not its ongoing operations.
¶ 30. Because the Salyers did not allege any property damage caused by Harris’s “ongoing operations,” Ohio Casualty owed Noble no duty to defend and/or indemnify the Salyers’ lawsuit. Therefore, Noble failed to show Ohio Casualty breached any contractual obligation owed to Noble. See Architex, 27 So.3d at 1157 (¶ 21) (citing S. Life & Health Ins. v. Kemp, 300 So.2d 782, 785 (Miss.1974)) (“The burden of proving coverage rests with the insured.”). Consequently, the circuit court properly dismissed on summary judgment Noble’s claims of breach of contract, breach of the duty of good faith and fair dealing, and bad faith denial of insurance benefits.
II. No Additional Claims Against Ohio Casualty, Horne, or Wellington Associates
¶ 31. Noble keeps characterizing this case as being about more than coverage under the endorsement, asserting that resolving the coverage issue in Ohio Casualty’s favor does not necessarily resolve its other claims. But we agree with the circuit judge that Noble has no other viable claims against any of the defendants.

A. Waiver and Estoppel

¶ 32. Noble raises the quasi-contractual theories of waiver and estop-pel [3] for why Ohio Casualty still had a duty to defend and indemnify Noble even if the Salyers’ claim was not covered by the additional-insured endorsement. But the longstanding law in Mississippi is that “[w]aiver or estoppel cannot operate so as to bring -within the coverage of the policy property, or a loss, or a risk, which by the terms of the policy is expressly excepted or otherwise excluded.” Emp’rs Fire Ins. v. Speed, 242 Miss. 341, 346,133 So.2d 627, 629 (1961). Because “coverage or restrictions on the coverage cannot be extended by the doctrines of waiver or estoppel,” the circuit judge correctly held that Noble’s waiver and estoppel arguments against Ohio Casualty fail as a matter of law. Id.

B. Detrimental Reliance

¶ 33. Noble also lodges contract-based and quasi-contract claims against Horne and Wellington Associates. But Noble cannot point to any contractual obligation Horne and/or Wellington Associates owed it. The agreement to name Noble as an additional insured on Harris’s CGL policy was between Noble and Harris. Horne merely acted at Harris’s request. So any claim Noble did not get the coverage it bargained for would be against Harris — which Noble neither sued in its federal lawsuit nor the present state-court action.
¶ 34. Instead, Noble has sued Horne and Wellington Associates for “detrimental reliance.” “Detrimental reliance” is an element of both promissory estoppel and equitable estoppel. Weible v. Univ. of S. Miss., 89 So.3d 51, 67 (¶ 52) (Miss.Ct.App.2011) (citation omitted). Promissory estoppel legally enforces a promise made without consideration — so no contract was formed — because three things happened: (1) the promise was made with the intent it would be relied upon; (2) the promise was indeed relied upon; and (3) it would be unjust not to enforce the promise. Id. Equitable estoppel enforces an otherwise unenforceable contract because one party has received a benefit under the contract, and it would be unjust to allow that party *722 to avoid the contract’s obligations due to some issue with the contract’s enforcement. Id.
¶ 35. Here, Noble has produced no evidence to create a jury question for either form of estoppel. It neither points to any promises that Horne or Wellington Associates made to Noble nor any unenforceable contract it entered into with Horne and Wellington Associates, from which they have unjustly received a benefit. The only interaction these defendants had with Noble was mailing it the certifícate of insurance. And the certificate was not a contract, as it clearly stated it conferred no rights on Noble. All the certifícate did was notify Noble it had been added as a named insured to Harris’s CGL policy, subject to the terms of that policy.
¶ 36. Noble has not alleged — and has not offered any proof — that Horne or anyone else at Wellington Associates promised any additional or different coverage than what was clearly stated in the terms of the policy and additional-insured endorsement. So without a promise or an otherwise-unenforceable contract, Noble has no “detrimental reliance” claim against Horne and Wellington Associates.

C. Negligent Misrepresentation

¶ 37. Noble’s final claim against Horne and Wellington Associates was for negligent misrepresentation.[4] However, for there to be negligent misrepresentation, it must first be shown there was a misrepresentation of fact. See Spragins v. Sunburst Bank, 605 So.2d 777, 780 (Miss.1992) (citations omitted). And neither Horne nor anyone at Wellington Associates falsely represented anything to Noble. They merely mailed Noble the certificate of insurance. The certificate represented that Noble, as “certificate holder,” had been named as an additional insured. Nothing about this statement was false. As the cover sheet of Harris’s CGL policy indicates, Noble was listed as a named additional insured. Further, the certificate of insurance was clear that Noble, as an additional insured, was subject to the policy’s terms, conditions, and exclusions— including the endorsement’s “ongoing operations” limitation. Noble has neither alleged nor offered evidence of representations by Horne or other employees of Wellington Associates that the endorsement’s coverage deviated from its express terms.
¶ 38. Based on the undisputed facts, Ohio Casualty, Horne, and Wellington Associates were entitled to a judgment as a matter of law on every claim Noble brought against them. We thus affirm the circuit court’s order granting summary judgment in their favor.
¶ 39. THE JUDGMENT OF THE MADISON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE, C.J., IRVING, P.J., BARNES, ISHEE, ROBERTS, CARLTON AND FAIR, JJ„ CONCUR. JAMES, J„ DISSENTS WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, P.J., NOT PARTICIPATING.

. The Salyers also sued the engineer who performed the initial inspection and Noble Real Estate’s principal Arthur Noble, individually, based on Arthur's personal representations that he would pay for any necessary repairs made on the home.

. Arthur Noble, individually, joined his company in filing suit. While Arthur was sued by the Salyers individually, the separate claims against him have nothing to do with Harris’s dirt work, but instead relate to alleged misrepresentations by Arthur, which in no way *718 can be argued were covered by additional-insured endorsement to Harris’s CGL policy. As Arthur has no claims separate and district from Noble Real Estate, this opinion will refer to both plaintiffs, now appellants, as "Noble.”

. While Noble asserted "detrimental reliance” as a separate claim, detrimental reliance is merely an element of estoppel. Weible v. Univ. of S. Miss., 89 So.3d 51, 67 (¶ 52) (Miss.Ct.App.2011) (citation omitted).

. We note that Noble also brought a claim of negligent infliction of emotional distress against Horne and Wellington Associates. But this claim is so lacking in substance, that we affirm the dismissal of this claim by summary judgment without any further discussion.