# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 11, 2014

No. 12-60561

Lyle W. Cayce
Clerk

CARL E. WOODWARD, L.L.C.; GRAY INSURANCE COMPANY,

Plaintiffs - Appellees - Cross Appellants

v.

ACCEPTANCE INDEMNITY INSURANCE COMPANY,

Defendant - Appellant - Cross Appellee

Appeals from the United States District Court
for the Southern District of Mississippi

Before GARZA, SOUTHWICK, and HAYNES, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

This appeal presents the final set of issues arising from claims of negligent construction of a condominium project in south Mississippi. The remaining parties are a contractor and two insurers. The district court held that a subcontractor's Commercial General Liability ("CGL") insurer breached its duty to defend the general contractor. Disputed on appeal are the district court's holding that there was a duty to defend, the allocations of costs and attorneys' fees, the award of extracontractual damages but denial of punitive damages, a refusal to award pre-judgment interest, and the denial of permission to file a post-appeal motion for attorneys' fees.

No. 12-60561

We conclude that the district court erred in holding that there was a duty to defend. The allegations in the complaint, even if properly supplemented by an engineer's report that we will later describe, did not place the CGL insurer on notice of a claim under the policy. In light of that conclusion, the remaining appellate issues that concern the calculation and allocation of the costs of the alleged failure to defend are moot. We REVERSE and REMAND for entry of judgment for the subcontractor's insurer.

## BACKGROUND

Pass Marianne, L.L.C. contracted for the construction of condominiums on the Mississippi Gulf Coast. The general contractor was Appellee Carl E. Woodward. Among the subcontractors was DCM Corporation, L.L.C., who entered a contract with Woodward for the concrete work. In November 2005, DCM obtained a CGL policy from the Appellant, Acceptance Indemnity Insurance Co. DCM worked on the project from January to October 2006. The entire project was completed in August 2007. In October 2007, Pass Marianne sold the condominiums to Lemon Drop Properties.

A year after purchasing the condominiums, Lemon Drop brought suit in Mississippi state court against its seller, Pass Marianne, and against Woodward. It sought rescission and actual and punitive damages for breach of contract and for gross negligence. Pass Marianne filed a cross-claim against Woodward alleging faulty construction and damage arising out of the construction. The claims were eventually arbitrated. One of the most significant issues in the arbitration was the fault of the concrete subcontractor, DCM.

Woodward was an additional insured under the CGL policy that Acceptance issued to DCM. After Pass Marianne asserted its claims, Woodward

2

No. 12-60561

through counsel demanded on May 6, 2009 that Acceptance provide a defense and indemnity. Woodward sent to Acceptance the complaint in the lawsuit and a report Pass Marianne had commissioned from the Rimkus Consulting Group which stated conclusions about the nature and effect of the defective work. We later discuss relevant details of the complaint and the Rimkus Report.

Acceptance responded by letter on September 11, 2009. It refused to defend Woodward based on language in the following policy endorsement, which, after identifying Woodward as an additional insured, limited coverage:

> A. Section II – Who is An Insured is amended to include as an insured the person or organization shown in the Schedule [Woodward], but only with respect to liability arising out of your ongoing operations performed for that insured.

In summary, the insured was DCM, the concrete subcontractor who is not now a party. The endorsement stated that the general contractor, Woodward (who along with its insurer is the Appellee here), could draw on the policy issued to DCM by the Appellant Acceptance "only with respect to liability arising out of [DCM's] ongoing operations performed for that insured," *i.e.,* Woodward.

After quoting the foregoing policy language, the letter from Acceptance also stated:

> Additionally, with respect to the subcontract agreement between [Woodward] and [DCM], based on information presently available to us, the Substantial Completion of the subject property occurred on August 6, 2007, subsequent to the policy expiration date. Therefore, we must respectfully deny your tender of defense and indemnity.

Though not quoted in the September denial letter, the Endorsement that made Woodward an additional insured also contained this exclusion:

3

No. 12-60561

B. With respect to the insurance afforded to the additional insured, the following exclusion is added:

Exclusions
This insurance does not apply to "bodily injury" or "property damage" occurring after:

(1) All work, including materials, parts  or equipment furnished in connection with such work, on the project . . .to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed; . . . .

After Acceptance and other insurers refused to defend, Woodward and its insurer, Gray Insurance Company, filed a new suit in October 2009 in Mississippi state circuit court against Acceptance and several other insurers. Woodward and Gray claimed these defendant insurers failed to defend and indemnify Woodward in the arbitration.  The case was removed to the United States District Court for the Southern District of Mississippi.  By October 2010, all insurers settled except for Acceptance. Woodward, Gray and Acceptance filed motions for summary judgment.  The district court held that Acceptance had a duty to defend Woodward.

The district court concluded that certain issues could not be resolved on summary judgment. Eventually, the district court conducted both a jury trial and a bench trial as to different issues involving the financial burdens arising from the claimed breach of the duty to defend.  The district court entered a final judgment for a total award to Woodward and Gray of $999,144.79.  The award was composed of attorneys' fees, the costs of arbitration, and extra-contractual damages.  Acceptance appealed, and Woodward filed a cross-appeal.

This appeal turns solely on the validity of the district court's conclusion that Acceptance had a duty to defend.  We will discuss no other issue.

4

No. 12-60561

DISCUSSION

*I.  Duty to Defend – Preliminary Points*

The district court held on summary judgment that Acceptance had a duty to defend Woodward.  We give *de novo* review to a district court's grant of summary judgment, applying the same standard as did the district court. *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 753 (5th Cir. 2011). We review the district court's conclusions of law, including the interpretation of a contract, *de novo.  In re Liljeberg Enters., Inc.*, 304 F.3d 410, 439 (5th Cir. 2002).  The parties agree that because Acceptance issued the policy in Mississippi to a named insured who resided in and was a citizen of that state, we are to apply Mississippi rules of construction to our interpretation of the policy.  "The interpretation of an insurance policy is a question of law, not one of fact."  *Corban v. United Servs. Auto. Ass'n*, 20 So. 3d 601, 609 (Miss. 2009). We review the district court's factual findings for clear error.  *Goodrum v. Quarterman*, 547 F.3d 249, 255 (5th Cir. 2008).

After oral argument, Acceptance raised a new issue under the policy.  It submitted two letters under Federal Rule of Appellate Procedure 28(j) that focus on whether Pass Marianne's claims ever identified an "occurrence" under the language of this CGL policy.  Acceptance did not make that argument as a specific issue in its briefs.[1]  To support that the issue of "occurrence" had earlier been briefed, Acceptance, in one of its Rule 28(j) letters quoted eight sentences scattered over thirteen pages that discuss points relevant to such an argument.

---

[1]  Indicative of what was not briefed is that neither of the precedents relied upon in a recent Mississippi decision on this issue, to which Acceptance alerted us in a Rule 28(j) letter, nor any related opinions, were cited or discussed in its briefs.  *See W. R. Berkley Corp. v. Rea's Country Lane Const., Inc.*, __ So. 3d __ 2013 WL 3884909 (Miss. Ct. App. July 30, 2013).

No. 12-60561

Such random and unfocused references that do not cite the record or relevant caselaw are insufficient briefing to preserve an issue for our review. *United States v. Stalnaker*, 571 F.3d 428, 439-40 (5th Cir. 2009). Acceptance waived the issue through inadequate briefing on appeal. FED. R. APP. P. 28(a)(8)(A).

### II. *The Complaint and the Policy*

Under Mississippi law, when determining whether an insurer has a duty to defend, courts must overlay the language of the policy with the facts alleged in the complaint. *See Auto. Ins. Co. of Hartford v. Lipscomb*, 75 So. 3d 557, 559 (Miss. 2011). No duty arises when the alleged conduct falls outside the policy's coverage. *Id.*

Pass Marianne was a defendant in the suit brought by Lemon Drop, making the cross-claim Pass Marianne filed against co-defendant Woodward the relevant "complaint." The first part of the cross-claim that the parties identify as relevant is Pass Marianne's allegations of the following facts:

> (3) Woodward built the foundation piers in non-conformity with plans and specifications and altered the blueprints in an attempt to cover up this problem;

The only other identified section is Pass Marianne's claim of a breach of contract.[2] After realleging the foregoing facts, it stated as follows:

### COUNT III. <u>BAD FAITH/BREACH OF CONTRACT</u>

> (43) [Woodward], independently and through their subcontractor,

---

[2] The elements of breach of contract in Mississippi are: (1) the existence of a valid and binding contract; and (2) its breach by the defendant. *Bus. Commc'ns, Inc. v. Banks*, 90 So. 3d 1221, 1224-25 (Miss. 2012). A tortious breach additionally requires an "intentional wrong, insult, abuse, or negligence so gross as to constitute an independent tort." *Eselin-Bullock & Assoc. Ins. Agency, Inc. v. Nat'l Gen. Ins. Co.*, 604 So. 2d 236, 240 (Miss. 1992).

No. 12-60561

> Jim Wallis and Son Roofing, Inc. intentionally and willfully violated their contractual obligations to [Pass Marianne] in multiple cost cutting and gouging ploys so as to entitle [Pass Marianne] to damages, to include punitive damages due to the malicious and willful nature of said breach.

Though Pass Marianne did not mention DCM in this cross-claim, it did reference an aspect of the project that was DCM's operational responsibility.

Besides sending the complaint with its letter demanding that DCM's insurer, Acceptance, and other insurers provide a defense, Woodward also sent a report prepared by Rimkus Consulting Group, which was employed by Pass Marianne in the arbitration and litigation. Generally, an insurance company's duty to defend arises only if a complaint has been filed that contains allegations of conduct covered by the policy. *Lipscomb*, 75 So. 3d at 559. Nonetheless, if an insurer's independent investigation establishes facts that would present a claim "which potentially would be covered under the policy, the insurer must provide a defense until it appears that the facts upon which liability is predicated fall outside the policy's coverage." *Id.*

For our analysis, we assume without deciding that *Lipscomb* would make the Rimkus Report relevant for purposes of determining whether Acceptance had a duty to defend Woodward. The Rimkus Report was lengthy. Its conclusions about concrete subcontractor DCM were that it did not comply with the Design/Build Agreement or industry standards because the atrium floor was not properly sloped, which prevented water from entering the drains properly. The Rimkus Report claimed that DCM failed to comply with the construction drawings and industry standards by not installing a step in the slab at the balcony exterior walls and doors. This problem allegedly caused damage to the exterior walls of the condominium units. The Rimkus Report also concluded that

7

No. 12-60561

the balcony floors were not properly sloped to allow proper drainage and described problems with the finish of the concrete in the parking garage and unsightly trenches that were cut into the concrete to assist with drainage.

In summary, Pass Marianne's cross-claim that DCM's work did not conform to specifications was supported by the Rimkus Report. The cross-claim also alleged that the reasons for non-conformance were the intentional and willful acts of the contractor Woodward and a subcontractor. The question for Acceptance, and now for us, is whether those claims created a duty to defend under this particular policy.

We have previously quoted the policy language Woodward relied on in its demand letter, namely, the additional-insured endorsement. It contained two clauses that are relevant to this appeal. Section A provided that Woodward was an insured, "but only with respect to liability arising out of your [DCM's] ongoing operations performed for that insured," Woodward. Second, Section B stated that the policy "does not apply to 'bodily injury' or 'property damage' occurring after [all work] to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed."

Both sections affect the scope of coverage offered by the additional-insured endorsement. The first section establishes the broad parameters of the coverage as matters "arising out of [DCM's] ongoing operations." The second limits the scope of coverage, specifically excluding property damage that occurs after all the work at the site of the "covered operations have been completed."

Acceptance does not dispute that the policy is an occurrence policy. An occurrence policy provides coverage "regardless of when the act complained of was discovered or notice provided to the insurer, as long as the act occurred during the policy period." *Titan Indem. Co. v. Williams*, 743 So. 2d 1020, 1024

No. 12-60561

(Miss. Ct. App. 1999).  While the plain language of the policy provides coverage only when damages occur during the policy period, there is no textual requirement that liability arise *during* ongoing operations, only that liability arise *out of* ongoing operations.  We agree with a decision applying Mississippi law that policy language providing coverage for "liability arising out of your work," requires only "a causal connection to 'your work.'"  *Roy Anderson Corp. v. Transcon. Ins. Co.*, 358 F. Supp. 2d 553, 562 (S.D. Miss. 2005).

In sum, the claim for liability need not be alleged *during* ongoing operations.  By that we mean that claims need not be asserted during the named insured's ongoing operations to fall within the scope of coverage, but the claims must be causally related to the ongoing operations.  *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 753 (Miss. 2003).  We cannot stop here, though.  Besides giving the words their plain and ordinary meaning, our interpretation must give effect to each clause. *Id.* The additional-insured endorsement excludes property damage occurring after all work has been completed.  This provision must be given equivalent weight when reading the contract as a whole.

We now compare the complaint and the policy in order to analyze whether a duty to defend arose.

### *III.  Analysis of Whether a Duty to Defend Arose*

Mississippi substantive law governs this suit.  The meaning of "arising out of [an insured's] ongoing operations" is the phrase in need of interpretation.  There is no relevant decision from the Mississippi Supreme Court, leaving us to predict how that court would decide the issue.  *Paz v. Brush Engineered*

9

No. 12-60561

*Materials, Inc.*, 555 F.3d 383, 392 (5th Cir. 2009). Mississippi's intermediate court has recently addressed the issue. When lacking a ruling from the relevant jurisdiction's highest court, we will examine decisions of lower courts for persuasive explications of state law. *See Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000).

The Mississippi Court of Appeals discussed the meaning of a CGL policy's additional-insured endorsement limiting coverage to "liability . . . caused in whole or in part by [the subcontractor's] ongoing operations performed for" the additional insured. *Noble v. Wellington Assoc.*, 2013 WL 6067991 (Miss. Ct. App. November 19, 2013). Noble Real Estate, Inc. hired a subcontractor, Harris, to perform dirt work and site preparation for a house it was building. *Id.* at *1. Noble was listed as an additional insured on Harris's CGL policy, but the endorsement was limited to liability caused by Harris's "ongoing operations" performed for Noble. *Id.* Harris completed his work by March 2006, and then Noble built a house on the site. More than a year and a half after Harris had completed his work, Noble sold the house. *Id.* at *2. The purchaser noticed cracks in the house and an engineer determined there were foundation problems, partially linked to the fill dirt beneath the slab. *Id.* The purchaser sued Noble, who in turn sought coverage under Harris's CGL policy's additional-insured endorsement. *Id.* at *3.

The Mississippi Court of Appeals interpreted the phrase "ongoing operations" to refer to actions "actually in process," concluding it could not encompass "completed operations." *Id.* at *4. The court rejected Nobles argument that the phrase "caused . . . by [Harris's] ongoing operations" was a causal limitation to coverage rather than temporal, concluding that

10

interpretation would read the word "ongoing" out of the endorsement. *Id.* at \*5. The court determined it was "clear from the language of the endorsement that Noble was only an additional insured for liability caused by Harris's *active* work on the site" and "equally clear the endorsement did not cover property damage manifesting itself *after* Harris stopped working on the site." *Id.* The court concluded that if Harris's performance caused the damage for which Noble was liable, the cause was Harris's completed work, not its ongoing operations. *Id.* Accordingly, Harris's insurer did not owe any contractual duty to defend or indemnify Noble under the terms of the additional-insured endorsement. *Id.*

The *Noble* decision relied in part on a Colorado Court of Appeals opinion discussing a similar provision in an insurance policy. *Id.* at \*4 (citing *Weitz Co., LLC v. Mid-Century Ins. Co.,* 181 P.3d 309 (Colo. App. 2007)). In *Weitz*, five months after a subcontractor's work was completed, the property owner observed water intrusion damage and sued the general contractor. *Weitz*, 181 P.3d at 310-11. The general contractor later brought suit against the subcontractor's insurance carrier, asserting claims that included bad faith breach of the insurance contract. *Id.* at 311. The Colorado court considered whether the additional-insured endorsement, which extended the subcontractor's liability coverage to the general contractor only against liability "arising out of [the subcontractor's] ongoing operations," also insured the general contractor against liability arising out of the subcontractor's "completed operations." *Id.* at 312. With reference to the plain meaning of words through dictionary definitions, the court unpacked the term "ongoing operations" as follows:

> Neither "ongoing operations" nor "completed operations" is defined in the policy. However, "ongoing" is generally defined as "that [which] is going on: a: that [which] is actually in process . . . b: that

No. 12-60561

[which] is continuously moving forward." *Webster's Third New International Dictionary* 1576 (2002) *(Webster's 2002) . . . .*

By contrast, "complete" is generally defined as "[b]rought to an end or to a final or intended condition; concluded; completed; as, the edifice is *complete.*" *Webster's New International Dictionary* 456 (1927) (emphasis in original) *(Webster's 1927) . . . .*

"Operation" is generally defined as "a doing or performing esp. of action: WORK, DEED." Webster's *2002*, *supra*, at 1581. The term "operations" as used in the policy is the plural of "operation."

*Id.* at 313 (alterations in original; some citations omitted). Because the contractor's liability for the water intrusion damage arose out of the subcontractor's completed operations – the work was completed five months before the intrusion – rather than its ongoing operations, there was no coverage under the additional-insured endorsement. *Id.* at 315.

We are persuaded by *Noble.* Both *Noble* and *Weitz* support the proposition that claims for liability can be brought after ongoing operations are complete, but the underlying liability cannot be due to the "completed operations." Acceptance's additional-insured endorsement uses language limiting coverage to liability arising out of ongoing operations that is very similar to the language analyzed by the *Weitz* court. Further, Acceptance's additional-insured endorsement also includes a specific exclusion for property damage occurring after all work has been completed. We interpret this endorsement as applying to DCM's ongoing operations, regardless of when the claim is filed, so long as the liability does not arise out of completed operations.

The conclusions drawn here are conclusions of law. The effect of a contrary conclusion bears noting. Allowing coverage under this endorsement because of an allegation that the additional insured failed to follow plans and

specifications, effectively converts a CGL policy into a performance bond. These two insurance products serve different ends. Mississippi courts have recognized that CGL policies serve limited purposes based on their specific terms and exclusions. For example, a recent Mississippi Court of Appeals case closely parsed the language of a CGL policy, finding that it was intended to cover accidental occurrences during construction, not intentional actions undertaken by the insured contractor. *See W.R. Berkley Corp., v. Rea's Country Lane Constr. Inc.*, __ So. 3d __, 2013 WL 3884909 (Miss. Ct. App. July 30, 2013). Consequently, the court reversed and rendered judgment in favor of the insurer because the claims did not trigger the duty to defend. On the other hand, a performance bond is a form of insurance that guarantees the completion of the general contractor's work on the project. *See* SCOTT C. TURNER, INSURANCE COVERAGE OF CONSTRUCTION DISPUTES § 1:2 (West 2013). This Circuit has previously noted the significance of the difference between these two forms of insurance: "A CGL policy generally protects the insured when his work damages someone else's property. The 'your work' exclusion prevents a CGL policy from morphing into a performance bond covering an insured's own work." *Wilshire Ins. Co. v. RJT Const., LLC,* 581 F.3d 222, 226 (5th Cir. 2009).

Accordingly, the central issue is whether Woodward's liability arose out of DCM's ongoing operations or its completed operations. This determination is governed by the facts alleged in the complaint or, as here, in cross-claims. *Auto. Ins. Co. of Hartford*, 75 So. 3d at 559. Liability "arises out of" the primary insured's operations if it is causally connected to the primary insured's operations. *See, e.g.*, *Mid-Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 497 (5th Cir. 2000). It is apparent from the face of the cross-claim that Pass Marianne's claims for fraud, defamation, and breach of contract did not arise out

No. 12-60561

of DCM's ongoing operations of work for the condominiums.[3] We have previously quoted Pass Marianne's relevant claim: "Woodward built the foundation piers in non-conformity with plans and specifications and altered the blueprints in an attempt to cover up this problem . . . ." Pass Marianne then used these facts to support a claim that Woodward and a subcontractor other than DCM had violated their contract with Pass Marianne in an intentional and willful manner, and that the violation caused damages.

Pass Marianne's allegation that the foundation piers did not conform to specifications is a claim of a construction defect. There was not an attendant allegation that the non-conformity caused other damage. We will use the term "construction defects" to mean workmanship not consistent with plans and specifications. We do not include within the term any faulty workmanship in violation of industry standards because the relevant claim here does not allege any such defect.[4] We have already determined that Pass Marianne did not allege that the non-conforming concrete work led to any other damages while operations were ongoing. Though any non-conforming construction by DCM would have occurred during its ongoing operations, liability for defective work, such as was alleged here, depends on other policy language. We will discuss how

---

[3] Pass Marianne's claims for fraud and defamation arise from Woodward's alleged intentional conduct, not DCM's ongoing operations. Fraud and defamation involve intentional acts with no causal relationship to the ongoing concrete and construction work.

[4] One of the decisions relied upon by the district court simply for the principle that unambiguous contracts are construed as written, discusses coverage of "faulty workmanship." *See Architex Ass'n, Inc. v. Scottsdale Ins. Co.*, 27 So. 3d 1148, 1161 (Miss. 2010). The state court analyzed whether property damage, if caused by faulty workmanship, would be covered under policy language requiring an "occurrence." *Id.* We discussed earlier that Acceptance did not sufficiently raise the question of whether an "occurrence" was involved here. Thus, the central issue in *Architex* need not be addressed in our case. There was no discussion in *Architex* of how to apply a policy provision regarding ongoing operations.

14

such liability is assessed.

Courts have held, quite logically, that liability for construction defects arises out of a subcontractor's completed operations. *See Weitz Co.*, 181 P.3d at 312 (holding construction defect liability was not covered under additional-insured endorsement because it arose out of subcontractor's completed operations); *Absher Const. Co. v. N. Pac. Ins. Co.*, 861 F. Supp. 2d 1236, 1250 (W.D. Wash. 2012) (finding that a construction defect, a heating system failure, was excluded from coverage because it fell outside the "ongoing operations" clause and was also excluded as "completed" work). Here, the alleged breach is that the subcontractor did not build the foundation piers according to plans. That is an allegation that the completed building did not satisfy the terms of the parties' contractual agreement. Accordingly, even if Woodward's liability for Pass Marianne's breach of contract claim is related to DCM's concrete work, Woodward's liability did not arise out of DCM's ongoing operations. The breach necessarily arises from the completed construction, which is the point in time when Pass Marianne received the completed building.

Woodward disputes this conclusion, arguing that Pass Marianne's ownership of the property during construction means it was damaged regardless of when it received the completed project. By this logic, a project owner could assert a breach of contract claim against a contractor for any error made during the course of construction, notwithstanding that the contractor might correct the problem before completing the project. Rather, the caselaw we have discussed supports that the liability for a construction defect, and any consequent breach of contract, is determined after completion. This proposition is also supported by the Mississippi courts' determination that claims arising from construction defects accrue, for statute of limitations purposes, after the construction project

No. 12-60561

has been completed.[5]  It follows that liability for construction defects, while created during ongoing operations, legally arises from completed operations.

It is true that Woodward's liability for the alleged damage is causally related to DCM's operations.  Though a causal relation is required, the policy specifically excludes liability for property damage occurring after all work has been completed.  The damage alleged here arose from completed operations.

Woodward also argued that Acceptance waived the argument we just discussed, namely, that no duty to defend Woodward existed because liability did not arise out of DCM's ongoing operations.  The evidence relevant to waiver is that in its memorandum in support of a partial summary judgment to dismiss all claims of bad-faith, Acceptance stated that the relevant damage occurred during DCM's ongoing operations.  We examine the memorandum.

One relevant section of Acceptance's summary judgment memorandum refers to a different policy exclusion.  It is one denying coverage for damage to the property "on which you . . . are performing operations, if the 'property damage' arises out of those operations; or . . . [t]hat particular part of any property that must be restored or replaced because 'your work' was incorrectly performed on it."  The memorandum then discusses evidence that the construction defects were discovered and rectified prior to the date of substantial

---

[5]The Mississippi statute of limitations period for actions arising from construction deficiencies is six years. MISS. CODE ANN. § 15-1-41 (West 2013).  Courts applying this statute have determined that claims accrue after the project is completed, often when the owner or occupant takes possession.  *See, e.g.*, *Reich v. Jesco, Inc.*, 526 So. 2d 550 (Miss. 1988) (holding defective design and construction claims arising from the collapse of a chicken house roof accrued when the owner began actual use or occupancy of the building – after construction was completed.); *Lampkin v. Thrash*, 81 So. 3d 1193, 1198 (Miss. Ct. App. 2012) (holding that breach of warranty in construction of personal residence claim accrued on the date of occupancy of the property – after construction was completed).

completion.  To apply this language to the argument being made on appeal, namely, that "liability" must arise out of "ongoing operations," is improperly to equate the *damage* that the cross-claim described as being the non-conformity of the work to the plans during ongoing operations with the need that *liability* arise out of ongoing operations.  We have already explained why that liability arises after completion.

The other part of Acceptance's summary judgment memorandum that is said to constitute waiver is in an argument about the exclusion located in the additional-insured endorsement.  It excludes, as we quoted in full earlier, coverage for any "property damage" that occurs after all work has been completed.  Acceptance repeats its earlier argument that "most, if not all, of the alleged 'property damage'" the cross-claim asserts is for the non-conformity to plans and specifications that was discovered during construction and rectified.  Nonetheless, Acceptance also argued that if property damage were later discovered, then the additional-insured endorsement would exclude coverage of subsequent damage.  Regardless of this supplemental argument, neither the cross-claim nor the Rimkus Report ever identified damage relevant to DCM's work other than the non-conformity to the plans and specifications.

We find no inconsistency and no waiver in either of these arguments.  Our issue is not whether DCM failed to comply with plans and specifications during ongoing operations.  The issue is whether Woodward's liability arises out of those ongoing operations.  It did not.  Woodward's liability for breach of contract, if any, flows from defects in the completed construction project.

## CONCLUSION

The claims Pass Marianne alleged against Woodward in its cross-claim

and restated in the Rimkus Report did not arise out of DCM's ongoing operations. Even accepting the district court's factual finding that damage had occurred during ongoing operations, the only "damage" supported by allegation is the construction that was not in conformity with plans and specifications. Liability for such damages arises out of completed operations, for which Woodward was not an additional insured under the policy.

Because Pass Marianne's claims fell outside the coverage of the additional insured endorsement, Acceptance had no duty to defend Woodward. We REVERSE the finding that Acceptance breached its duty to defend and the award of damages, attorneys' fees, and costs. We REMAND to the district court for entry of judgment for Acceptance.