Eugina J. DANIELS and Isadora Susan Daniels, Appellants,

v.

LYONDELL–CITGO REFINING CO., LTD., Atlantic Richfield Company, and Lyondell Chemical Company f/k/a Lyondell Petrochemical Company, Appellees.

No. 01–01–00319–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 6, 2003.

Rehearing Overruled March 20, 2003.

Dennis C. Reich, Michael T. Howell, Reich & Binstock, PC, Houston, for Appellant.

James D. Ebanks, Giessel, Stone, Barker & Lyman, Houston, Larry Funderburk, Richard O. Faulk, Gaedere, Wynne, Sewell & Riggs, Houston, for Appellee.

Panel consists of Chief Justice RADACK and Justices NUCHIA and HANKS.

## OPINION

GEORGE C. HANKS, JR., Justice.

After James B. Daniels died of lung cancer allegedly caused by workplace exposure to benzene, Daniels's wife and daughter sued Lyondell–Citgo Refining Co., Ltd., Atlantic Richfield Company, and Lyondell Chemical Company f/k/a Lyondell Petrochemical Company,[1] the owners of the refinery where Daniels had worked. The trial court granted a no-evidence summary judgment in favor of the refinery owners on the issue of causation.

In two points of error, Eugina J. Daniels and Isadora Susan Daniels (the Daniels family) argue that they presented more than a scintilla of evidence on general and specific causation and that the trial court erred when it granted summary judgment. We affirm.

### Background[2]

James B. Daniels began working for a petrochemical plant in 1976. The plant is currently owned by Lyondell–Citgo Refining Co., Ltd., but was previously owned and operated by Atlantic Richfield Company and Lyondell Petrochemical Company. Throughout his career, Daniels worked in the Aromatics Recovery Unit (ARU), hold-

---

1. The Daniels family also sued Mundy Industrial Contractors, Inc., Mundy Industrial Service, Inc., Mundy Industrial Maintenance, Inc., Austin Industries, Inc., Austin Industrial Services, Inc., and Austin Industrial Maintenance, Inc. These entities are not parties to this appeal.

2. There was no recitation of facts in either the motion or responses to the motion for summary judgment. The background listed below is based on the recitation found in the Daniels family's third amended petition.

ing various positions as assistant stillman, helper, boardman, and operator.

During the course of his work, Daniels was exposed to a variety of chemicals, including benzene, mixed xylenes, ethylene, and propane. There were allegedly numerous benzene leaks, which usually occurred in conjunction with the plant's low-line connection and feed filtrate coils. The "low-line" is a system of pipes wherein various chemicals—including benzene—are moved throughout the plant. The feed filtrate coils take chemicals used for mixing chemical product from the "hot side" of the ARU the cooler side wherein they are actually mixed.

In October 1996, Daniels was diagnosed with bronchial alveolar carcinoma, a form of terminal lung cancer. He died in October 1997 at the age of 56.

The Daniels family sued the refineries for negligence and gross negligence in this wrongful death action. The petition alleged that the refineries were responsible for Daniels's death "through their willful act and omission or gross negligence in allowing the improper release of known carcinogens into Jim Daniels' (sic) work environment. By their wrongful conduct, Jim Daniels was exposed to carcinogens which resulted in his death."

The refinery owners filed a no-evidence motion for summary judgment based solely on the Daniels family's inability to show any evidence that benzene causes bronchial alveolar carcinoma in humans. A hearing was held on the motion, and the trial court granted the Daniels family additional time to conduct discovery. A second hearing was held, and the trial court granted the refinery owners' motion for summary judgment.

### Standard of Review

■ Under rule 166a(i), a party is entitled to summary judgment if, after adequate time for discovery, there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX.R. CIV. P. 166a(i). Thus, a no-evidence summary judgment is similar to a directed verdict. *Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W.2d 830, 834 (Tex.App.-Houston [1st Dist.] 1999, no pet.). The motion for summary judgment may not be general, but must state the elements on which there is no evidence. TEX.R. CIV. P. 166a(i).

■ The trial court must grant the motion unless the non-movant produces more than a scintilla of evidence raising a genuine issue of material fact on each of the challenged elements. TEX.R. CIV. P. 166a(i); *Macias v. Fiesta Mart, Inc.*, 988 S.W.2d 316, 317 (Tex.App.-Houston [1st Dist.] 1999, no pet.). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995).

### Causation

The central issue presented is not whether the Daniels family's witnesses possessed adequate credentials, skills, or experience to testify about causation. The issue before us is whether the trial court abused its discretion in finding that the Daniels family's evidence was scientifically unreliable and thus legally insufficient to defeat the refinery owners' motion for summary judgment.

■ Sometimes, causation in toxic tort cases is discussed in terms of general and specific causation. *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex.1997). General causation exists when a substance is capable of causing a particular injury or condition

in the general population, while specific causation exists when a substance causes a particular individual's injury. *Id.* In many toxic tort cases, direct experimentation cannot be done, and there will be no reliable evidence of specific causation. *Id.* at 715.

■ The Daniels family presented evidence from two experts—Michael Wolfson, M.D., a board certified specialist in occupational medicine, and Hari Dayal, Ph. D., a professor and researcher in human epidemiology at the University of Texas Medical Branch, Galveston—to support their general causation theory that occupational exposure to benzene at an oil refinery causes lung cancer. An expert's bare opinion will not suffice. *See Burroughs Wellcome,* 907 S.W.2d at 499–500. When the expert brings to court little more than his credentials and a subjective opinion, this is not evidence that would support a judgment. *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 421 (5th Cir.1987). The testimony of an expert is generally *opinion* testimony. Whether it rises to the level of *evidence* is determined under our rules of evidence, including rule 702, which require courts to determine if the opinion testimony will assist the jury in deciding a fact issue.[3] *Havner,* 953 S.W.2d at 712.

■ In *Havner,* the Texas Supreme Court clarified this determination as follows:

To say that the expert's testimony is some evidence under our standard of review simply because the expert testified that the underlying technique or methodology supporting his or her opin-

ion is generally accepted by the scientific community is putting the cart before the horse.

*Id.* The underlying data should be independently evaluated in determining whether the opinion itself is reliable.

■ In *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995), the Texas Supreme Court set forth some of the factors that courts should consider in looking beyond the bare opinion of the expert. Those factors include:

(1) the extent to which the theory has been or can be tested;

(2) the extent to which the technique relies upon the subjective interpretation of the expert;

(3) whether the theory has been subjected to peer review and publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6) the non-judicial uses that have been made of the theory or technique.

*See Robinson,* 923 S.W.2d at 557.[4] If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable. *Havner,* 953 S.W.2d at 714.

In point of error one, the Daniels family argues that it presented more than a scin-

---

3. Rule 702 provides as follows:
   If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

TEX.R. EVID. 702.

4. The issue in *Robinson* was admissibility of evidence, but the same factors may be applied in a no-evidence review of scientific evidence. *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 714 (Tex.1997).

tilla of evidence on general causation. It relies, to a considerable extent, on epidemiological studies for proof of general causation. Accordingly, we consider the use of epidemiological studies and the "more likely than not" burden of proof.

■ Epidemiological studies examine existing populations to attempt to determine if there is an association between a disease or condition and a factor suspected of causing that disease or condition. *Id.* at 715 (*citing* Bert Black & David E. Lilienfeld, *Epidemiologic Proof in Toxic Tort Litigation*, 52 FORDHAM L.REV. 732, 750 (1984)). Commentators in this area uniformly acknowledge that epidemiological studies cannot establish that a given individual contracted a disease or condition due to exposure to a particular drug or agent. *See, e.g.,* Michael Dore, *A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause–In–Fact,* 7 HARV. ENVTL. L.REV. 429, 431–35 (1983); Steve Gold, *Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion, and Statistical Evidence,* 96 YALE L.J. 376, 380 (1986).

**Relative Risk[5]**

■ Recognizing that epidemiological studies cannot establish the actual cause of an individual's injury or condition, a difficult question for the courts is how a plaintiff faced with this conundrum can raise a

fact issue on causation and meet the "more likely than not" burden of proof.

Generally, epidemiological studies showing an increased risk may support a recovery. The *Havner* court, recognizing that there is not a precise fit between science and legal burdens of proof, was persuaded that properly designed and executed epidemiological studies may be part of the evidence supporting causation in a toxic tort case and that there is a rational basis for relating the requirement that there be more than a "doubling of the risk" to the no-evidence standard of review and to the "more likely than not" burden of proof. *Havner,* 953 S.W.2d at 717.[6] "The use of scientifically reliable epidemiological studies and the requirement of more than a doubling of the risk strikes a balance between the needs of our legal system and the limits of science." *Id.* at 718.

The Supreme Court was careful to note, however, that a relative risk of more than 2.0 is not a litmus test and no single epidemiological test is legally sufficient evidence of causation. *Id.* Other factors, such as the *Robinson* factors, *supra,* must be considered because there may in fact be no causal relationship even if the relative risk is high.

**Scientific Reliability**

■ Sound methodology also requires that the design and execution of epidemiological studies be examined. For

---

5. Relative risk is the mortality of the exposed group divided by the non-exposed group. *Havner,* 953 S.W.2d at 721-22.

6. The Supreme Court explained the "doubling of the risk" as follows:

Assume that a condition naturally occurs in six out of 1,000 people even when they are not exposed to a certain [chemical]. If studies of people who [were exposed] show that nine out of 1,000 contracted the disease, it is still more likely than not that causes other than the [exposure] were responsible for any given occurrence of the

disease since it occurs in six out of 1,000 individuals anyway. Six of the nine incidences would be statistically attributable to causes other than the [exposure], and therefore, it is not more probable that the [exposure] caused any one incidence of disease. This would only amount to evidence that the [chemical exposure] could have caused the disease. However, if more than twelve out of 1,000 who [are exposed] contract the disease, then it may be statistically more likely than not that a given individual's disease was caused by the [exposure]. *Havner,* 953 S.W.2d at 717.

example, bias can dramatically affect the scientific reliability of an epidemiological study. *Id.* at 719. Epidemiological studies "are subject to many biases and therefore present formidable problems in design and execution and even greater problems in interpretation." *Id.* (*quoting* Marcia Angell, *The Interpretation of Epidemiologic Studies*, 323 NEW ENG. J. MED. 823, 824 (1996)). Expert testimony that is not scientifically reliable cannot be used to shore up epidemiological studies that fail to indicate more than a doubling of the risk. *Id.*

### Similarity

■ To raise a fact issue on causation and thus to survive legal sufficiency review, a claimant must do more than simply introduce into evidence epidemiological studies that show a substantially elevated risk. A claimant must show that he or she is similar to those in the studies. This would include proof that (1) the injured person was exposed to the same substance, (2) the exposure or dose levels were comparable to or greater than those in the studies, (3) the exposure occurred before the onset of injury, (4) the timing of the onset of injury was consistent with that experienced by those in the study, and (5) if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty. *Havner*, 953 S.W.2d at 720.

In sum, courts must make a determination of reliability from all the evidence. *Id.* Courts should allow a party, plaintiff or defendant, to present the best available evidence, assuming it passes muster under the five factors listed in the previous paragraph, and only then should a court determine from a totality of the evidence, considering all factors affecting the reliability of particular studies, whether there is legally sufficient evidence to support a judgment. *Id.* Finally, courts should not foreclose the possibility that advances in science may require re-evaluation of what is "good science" in future cases. *Id.* at 721.

■ The Daniels family's summary judgment evidence is grounded in three studies: (1) a 1989 study of Chinese factory workers, (2) a 1989 study of Italian refinery workers, and (3) a 1979 study of British workers. We will review each of these studies according to the factors delineated in *Havner*.

### 1. Chinese Factory Workers—1989[7]

This retrospective cohort study evaluated 28,460 benzene-exposed workers from 233 factories in China.[8] The primary types of factories or manufacturing processes involving benzene exposure were spray or brush painting, shoe manufacturing, synthetic rubber production, leather processing, organic chemical, and adhesive production facilities. Increased mortality was noted among benzene-exposed males in comparison with that among unexposed males. The standardized mortality ratio (SMR) was 2.31—thus satisfying the *Havner* requirement that the relative risk be more than 2.0. *See Havner*, 953 S.W.2d at 718. Importantly, however, the 2.31 SMR was for benzene-exposed non-smokers. The SMR for benzene-exposed smokers was 1.20. At the conclusion of the study, the authors stated that "the present study has suggested that other cancers, as well as some nonmalignant conditions, *may* be

---

7.  Yin, et. al., *A Retrospective Cohort Study of Leukemia and Other Cancers in Benzene Workers*, 82 ENVTL HEALTH PERSPS. 207–213 (1989).

8.  A cohort, or incidence study, is a prospective study that identifies groups and observes them over time to see if one group is more likely to develop a disease. *Havner*, 953 S.W.2d at 721.

associated with benzene exposure." (Emphasis added.)

This study was part of an ongoing analysis. There were at least three additional articles, all of which were attached as exhibits to the refinery owners' motion for summary judgment.[9] The results reported in the 1996 article indicated that, when the sample size was enlarged from 28,460 in the original study to 74,828 in the follow-up study, the mortality ratio for lung cancer for men exposed to benzene was 1.5, compared to 2.31 in the original study. Because the SMR was no longer doubled, we hold that the findings were no longer statistically significant.

The refinery owners refer us to the opinion of the Texarkana Court of Appeals, which held in *Austin v. Kerr–McGee Refining Corp.*, 25 S.W.3d 280 (Tex.App.-Texarkana 2000, no pet.), that summary judgment is proper when the scientific literature makes only general references, or does not connect the alleged carcinogen with the specific disease involved in the case at issue. *Id.* at 288. Here, having held that the study was not statistically significant, we need not determine whether it was overly broad and thus inapplicable when it referred to "lung cancer" as opposed to "bronchial alveolar carcinoma,"

the specific type of lung cancer that caused Daniels's death.

### 2. Italian Refinery Workers—1989[10]

This study examined the mortality rate of 1,595 males workers employed in one of the largest Italian refineries. The authors found that workers in the "moving department" had a significantly increased mortality from all cancers and a 3.6 SMR for lung cancer, specifically.[11]

Like the Chinese study, there was a follow-up to this study in 1999.[12] Also like the Chinese study, the follow-up found no risk-doubling for lung cancer.

### 3. British Workers—1979[13]

This study examined 15,032 male refinery workers. The study, however, was evaluating the effect on workers who were exposed to "crude petroleum, its fractions and polycyclic aromatic hydrocarbons." It did not specifically address benzene.

The study found an SMR of 1.89 from dying of lung cancer. Besides the fact that benzene was not addressed, the British study, like the Chinese and Italian studies, was updated by a follow-up study in 1992, which examined 34,597 employees.[14] This follow-up reiterated no risk-doubling, statistically significant excess of "bronchus/lung" cancer.

9. Yin, et. al., *An Expanded Cohort Study of Cancer Among Benzene-exposed Workers in China*, 104 ENVTL. HEALTH PERSPS. (1996); Yin, et. al, *A Cohort Study of Cancer Among Beneze–Exposed Workers in China: Overall Results*, 29 AM. J. INDUS. MED. (1996); Hayes, et. al, *Mortality among Benzene-exposed Workers in China*, 104 ENVTL. HEALTH PERSPS. (1996).

10. P.A. Bertazzi, et al., *Mortality Study of Cancer Risk Among Oil Refinery Workers*, 61 INT. ARCH. OCCUP. ENVTL. HEALTH, 261–270 (1989).

11. The study defined the "moving department" as follows: "[H]ere, crude oil is pumped to the processing units, different commercial products denatured, gasoline

ethylated, and all plant end-products moved by pumping to the storing and loading areas. No environmental measurements were available at the beginning of the study." *Id.* at 262.

12. Consonni, et. al, *Motality Study in an Italian Oil Refinery: Extension of the Follow–Up*, 35 AM. J. INDUS. MED. 287–294 (1999).

13. Hanis, et. al, *Cancer Mortality in Oil Refinery Workers*, 21 J. OCCUP. MED., March 1979, 167–74.

14. Schnatter, et. al, *A Retrospective Mortality Study Within Operating Segments of a Petroleum Company*, 22 AM. J. INDUS. MED. 209–229 (1992)

The Daniels family's experts relied on these three epidemiological studies to support their conclusion that benzene exposure caused Daniels's death. None of the studies has the *Havner* requisite risk-doubling; therefore, none of the studies reaches the *Havner* standard of statistical significance. The Daniels family presented no evidence of general causation. *See Havner*, 953 S.W.2d at 714 (holding that, if foundational data underlying opinion testimony are unreliable, experts will not be permitted to base opinions on that data.)

We overrule point of error one.

### Conclusion

Proof of both general and specific causation are required to defeat a no-evidence toxic tort summary judgment. Because the Daniels family failed to present summary judgment proof sufficient to raise a fact question concerning general causation, we need not address their second point of error asserting that they offered sufficient proof of specific causation. The trial court did not abuse its discretion when it granted the refinery owners' motion for summary judgment. We affirm the judgment of the trial court.